## In re GAYLORD et al.

### (District Court, E. D. Missouri, E. D. February 3, 1902.)

BANKRUPTCY — STOCKBROKER AND CUSTOMER — NATURE OF RELATION—SURRENDERING PREFERENCES.

The relation existing between stockbrokers and customers maintaining running accounts with them and buying stock on a margin is not fiduciary in its character, but is that of debtor and creditor, and a customer of a bankrupt broker, who has received a preference, is therefore within Bankr. Act, § 57g, which declares that the claims of creditors who have received preferences shall not be allowed unless the preference is surrendered.

In Bankruptcy.

See 111 Fed. 717.

George D. Reynolds, for trustee.

Isaac H. Orr, for claimant.

ADAMS, District Judge. The bankrupts, under the firm name of Gaylord, Blessing & Co., were brokers engaged in the business of buying and selling stocks, bonds, cotton, grain, and provisions for their customers. D. M. Gilbert was one of their customers. As the result of prior dealings with the bankrupts, he had to his credit on their books on October 31, 1900, the sum of $1,419.82. On November 3, 1900, he deposited with them the further sum of $250, which went to his general credit in an account kept with him by the bankrupts. The bankrupts had before then purchased for him 250 shares of the common stock of the St. Louis Transit Company, the purchase price for which, with commissions, etc., amounting to $5,400, stood on their books as a debit charge against Gilbert. On different dates between December 3, 1900, and March 4, 1901, the last-mentioned shares of stock, by Gilbert's direction, were sold for him by the bankrupts, resulting in a net profit of $424.50. This went to his credit in the general account. That account, on March 4, 1901, showed a balance due Gilbert of $2,094.32 as a net result of all the debit and credit entries. On the following day—March 5, 1901—the bankrupts, being then insolvent, and having been so insolvent for nine months theretofore, paid to Gilbert $1,200 on account, and charged the same to him in his account. This left a balance then due Gilbert of $894.32. On March 11, 1901, the bankrupts made a voluntary assignment under the laws of the state of Missouri, and on March 20, 1901, proceedings were instituted by their creditors to secure an adjudication of bankruptcy against them. An adjudication followed in due course. The main question submitted by the certificate of the referee is whether Gilbert can prove his demand for the sum of $894.32 without first surrendering the $1,200 so received by him on March 5th, within 15 days of the institution of the proceedings in bankruptcy. The payment of the $1,200 to Gilbert at the time and in the manner hereinbefore stated constituted a transfer of property by the bankrupts, so as to be an unlawful preference within the meaning of section 60 of the bankruptcy act. By the provisions of section 57g, the

receipt of such a preferential payment precludes proof of any claim for the balance due the preferred creditor, unless he shall first surrender the amount of the preferential payment. This is conceded to be the law, and it is also conceded that, if the relation existing between the bankrupts and Gilbert was that of debtor and creditor, the general rule is applicable to this case, requiring the surrender of the payment of $1,200 as a condition to the allowance of the demand presented. It is contended by the claimant that the bankrupts' relation to him was that of bailee or agent, acting in a fiduciary capacity, and that the legal consequence of that relationship is that the agent is pro hac vice the principal, and therefore that what he holds as such agent is held and owned by the principal. This theory really is that the fund in the hands of the bankrupts is a trust fund belonging to the beneficiary absolutely, but the claimant does not seem to carry his theory to its legitimate result. If he did, he would be here tracing a trust fund, and asserting exclusive right and title to the same as against all other creditors of the bankrupts. Instead of so doing, he presents a claim for the allowance of a general demand upon which he will ultimately receive only his pro rata share of all distributable assets. It is represented to the court that this case is one of many, and that its decision will govern others of like character now pending before the referee. Accordingly, careful consideration has been given to the merits of the matter.

Section 63 of the bankruptcy act provides: "Debts of the bankrupt may be proved and allowed against his estate, which are * * * (4) founded upon an open account or upon a contract express or implied." The facts found by the referee show that for some time before bankruptcy proceedings were instituted the bankrupts had an open running account on their books with the claimant. It does not appear that the claimant had ever actually purchased any stocks through the agency of the bankrupts, so as to finally receive any certificate upon full payment therefor. He had, on the other hand, been putting up "margins" as and when required to secure the bankrupts against fluctuations in market prices, ordering the purchase of one stock or another at a given price, and ordering the same sold when, in his judgment, he had made profit enough to satisfy his requirements, or sustained the limit of loss to which he was willing to submit. So far as he was concerned, his transactions seem to have amounted to a wager on the market price from day to day or week to week, and, so far as the bankrupts were concerned, the transactions, while doubtless in some instances of the character which might have bound the claimant to a legal liability to take and pay for the stock actually ordered purchased and actually purchased for his account, were in fact not intended for such purpose, but rather as bookkeeping transactions, intended by them as well as by the claimant to be closed out for a profit when possible, and at a loss when necessary. The account kept in the books was a running account, showing on one side credits to the claimant for all moneys put up as margins, and also for any and all profits when such were realized on sales, and on

the other side debits for commissions, interest on money employed, and losses sustained. The bankrupts intermingled claimant's money with their own and that of other customers. The parties treated each other as debtor and creditor. The books showed that relation, and the account presented for allowance in this case emphasized that fact. The certificate of the referee shows that it was admitted as a fact by the claimant "that the effect of the payment of $1,200 made to him by bankrupts on March 5, 1901, was and will be to enable claimant, as a creditor of bankrupts, to obtain a greater percentage of his debt than any other creditors of bankrupts of the same class." This admission, though adding nothing to the legal import of the facts themselves, strikingly shows that the claimant's pretensions are violative of the fundamental principle of equality, which underlies the bankruptcy act. Merchants who keep a debit and credit account with their customers in the usual way do not, in my opinion, occupy any substantially different relation to their customers than do these bankrupts to such a customer as Gilbert; yet merchants are required to surrender any and all preferential payments before being allowed to make proof of any balance shown to be due from the bankrupts. The immunity claimed for customers of brokers, resulting in the substantial defeat of the main purpose of the bankruptcy act, and also invidious distinctions between them and customers of merchants, should not be allowed, unless the dealings between them and their customers clearly disclose a fiduciary or trust relation with respect to the particular money or property in controversy; indeed, such a relation as vests title to the same in the customer so completely that he might successfully maintain an action at law or in equity for the recovery of the same in specie. If such be the situation, then the customer may not merely prove his claim for any such money or property, and share in the assets pro rata with other creditors, but he may successfully assert claim to the same to the exclusion of all others; and this on the distinct theory that such money or other property forms no part of the bankrupts' assets, but is the money or property of the customer himself, and that the customer may, if he is able to do so, trace the trust fund or property, and reclaim the same for his own use or benefit. Unless the situation is of the kind just mentioned, the customer's rights are simply those of a general creditor. In my opinion, the relation shown to exist between the bankrupts and Gilbert in this case was not of a fiduciary character. It was purely that of debtor and creditor.

Counsel were unable at the argument to call my attention to any authorities arising under the bankruptcy act of 1898 relating to the subject now before the court, and I have been unable to find any such authorities. But fortunately the bankruptcy acts of 1841 and 1867 gave occasion for consideration by the supreme court of the United States of questions kindred to those involved in the present inquiry. By the provisions of the bankruptcy act of 1841 (5 Stat. 441, § 1) the benefits of the acts were withheld from persons owing debts "created in consequence of a defalcation as a public officer or as executor, administrator, guardian or trustee or while acting in any

other fiduciary capacity"; and by the provisions of the same act (section 4) no person was entitled to a discharge who had applied trust funds to his own use. By the provisions of the bankruptcy act of 1867 "no debt created by the fraud or embezzlement of the bankrupt or by his defalcation as a public officer or while acting in any fiduciary character shall be discharged by proceedings in bankruptcy, but the debt may be proved and the dividend thereon shall be a payment on account of such debt." Rev. St. 1878, § 5117.

In the very early case of Chapman v. Forsyth, 2 How. 202, 11 L. Ed. 236, a case arose involving the interpretation of the foregoing provision of the act of 1841. The important question for determination was whether a commission merchant or factor who sells for others was indebted in a fiduciary capacity, within the meaning of the act of 1841, if he withheld the money received from property sold by him for his principal. The supreme court, speaking by Mr. Justice McLean, said, on this subject:

"If the act embraces such a debt, it will be difficult to limit its application. It must include all debts arising from agencies, and, indeed, all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act."

The court finally concludes that a factor occupies no such fiduciary relation to his principal as to create a trust as distinguished from a debt, within the meaning of the bankruptcy act.

In the case of Hennequin v. Clews, 111 U. S. 676, 4 Sup. Ct. 576, 28 L. Ed. 565, the supreme court, speaking by Mr. Justice Bradley on the subject of what is a fiduciary debt within the purview of the act of 1867, states the question before the court as follows:

"We have to decide the question whether a discharge in bankruptcy under the act of 1867 operates to discharge the bankrupt from a debt or obligation which arises from his appropriating to his own use collateral securities deposited with him as security for the payment of money or the performance of a duty, and his failure or refusal to return the same after the money has been paid or the duty performed; or whether a debt or obligation thus incurred is within the meaning of the thirty-third section of said act (section 5117, Rev. St.), which declares that 'no debt created by the bankrupt * * * while acting in any fiduciary character shall be discharged under this act.'"

It seems to me that this question presents a case fully covering the contention now before this court. If the appropriation of collaterals given to secure advances does not create a debt of a fiduciary character, certainly the balance found in the running account, resulting from mutual dealings between a broker and his principal, such as is disclosed in this case, does not constitute a trust fund in favor of the principal.

After so stating the question before the court, Mr. Justice Bradley first takes up the opinion in Chapman v. Forsyth, supra, and approves the same. He afterwards reviews many other cases, federal, state, and English, and concludes thus:

"The creditor who holds collateral holds it for his benefit under contract. He is in no sense trustee. His contract binds him to return it if its purpose as security is fulfilled; but, if he fails to do so, it is only a breach of contract, and not a breach of trust."

He also remarks as follows:

"It is no doubt true, as said in Chapman v. Forsyth, that a construction of the excepting clauses which would make them include debts arising from agencies would leave but few debts upon which the law could operate."

The following cases also afford ample authority for holding that the relation between the bankrupts and Gilbert was not fiduciary in its character within the meaning of the bankruptcy act, but was only that of debtor and creditor: Upshur v. Briscoe, 138 U. S. 365, 11 Sup. Ct. 313, 34 L. Ed. 931; Fleitas v. Richardson, 147 U. S. 538, 13 Sup. Ct. 429, 37 L. Ed. 272; Cronan v. Cotting, 104 Mass. 245, 6 Am. Rep. 232.

Collier, in the third edition of his work on Bankruptcy (page 206), says as follows:

"If factors are not fiduciary debtors, agents clothed with similar powers cannot be regarded as fiduciary debtors. Thus agents authorized by agreement to make sales, and to collect moneys and carry them into account, and pay over monthly or at other regular intervals, are to be treated as debtors, and not as trustees. They do not occupy a fiduciary capacity."

He cites in support of the text the following cases: Grover v. Clinton, Fed. Cas. No. 5,845; Kaufman v. Alexander, 53 Tex. 562; Guilfoyle v. Anderson, 9 Daly, 64; Cronan v. Cotting, supra. These cases have been examined, and, in my opinion, fully sustain the text.

The definition of a provable debt (section 63 of the act of 1898, supra) seems also to satisfactorily determine that the obligation of the bankrupts to Gilbert is a debt within the meaning of the act. It is undoubtedly founded upon an open account, and likewise creates an implied promise or contract on the part of the bankrupts to pay any balance appearing thereby to be due to Gilbert. According to the definition aforesaid, an obligation "founded upon an open account, or upon a contract, express or implied," is a provable debt under the bankruptcy act. There is no showing that the bankrupts kept Gilbert's money by itself. On the contrary, it sufficiently appears that the same was intermingled with that of other customers as well as that of the bankrupts themselves. The parties permitted the account to run for months in such a way as to clearly indicate their purpose to establish the relation of debtor and creditor between themselves. The obligation to pay was not only implied, but Gilbert, by presenting a claim for a debt instead of a claim for a trust fund belonging to him exclusively, affirmed the reasonable legal import of the relation between himself and the bankrupts to be that of debtor and creditor. On reason as well as authority I have reached the conclusion that Gilbert cannot be allowed to occupy any other position, and cannot make proof of any balance due him from the bankrupts, without first conforming to the provisions of section 57g, and surrendering the preferential payment received by him on account only a few days before bankruptcy proceedings were instituted.

No occasion is found to pass upon the other proposition submitted by the referee as to whether the fictitious purchase and sale of certain shares of Southern Railroad Company's stock created any obligation on the part of Gilbert to account for the fictitious loss sustained thereby. If Gilbert surrenders his preference, and proves up his claim, some such question may arise, and it will then require adjudication. Likewise the discrepancy between the amount of $850 actually claimed by Gilbert and the $894.32 which he might have claimed requires no present consideration.

The vital question in controversy has been determined. The result is that the action of the referee in allowing the claim of Gilbert without a previous surrender of the preferential payment received by him was error, and the same is disapproved. An order will now be made vacating the allowance as made, leaving Gilbert to take such action in the future as seems advisable to him.